

**ORDERED in the Southern District of Florida on June 5, 2012.**

**Erik P. Kimball, Judge**
**United States Bankruptcy Court**

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:                                                      CASE NO.:09-38535-EPK

OCEAN DEVELOPMENT 1, LLC,                  Chapter 11

      Debtor.
_____/
INDEMNITY INSURANCE COMPANY
OF NORTH AMERICA,

      Plaintiff,                                         ADV. PROC. NO.:10-03313-EPK
v.

OCEAN DEVELOPMENT 1, LLC,

      Defendant.
_____/
INDEMNITY INSURANCE COMPANY
OF NORTH AMERICA,

      Plaintiff,                                         ADV. PROC. NO.:11-01829-EPK
v.

PLATINUM REAL ESTATES, LLC,

      Defendant.
_____/

<u>ORDER DENYING MOTION FOR SUMMARY JUDGMENT</u>

**THIS MATTER** came before the Court upon the *Indemnity Insurance Company of North America's Motion for Summary Judgment and Incorporated Memorandum of Law* (the "Motion") [Adv. Pro. No.:10-03313-EPK, ECF No. 82 and Adv. Proc. No.:11-01829-EPK, ECF No. 37] filed by Indemnity Insurance Company of North America (the "Plaintiff" or "IINA"). Because there are material facts in genuine dispute, the Court denies the Motion.

At issue in this case is an insurance policy issued by IINA identified as HU No. 4930587 (the "Policy") covering the vessel known as the *PALM BEACH PRINCESS* (the "Vessel").

Prior to November 4, 2008, the Vessel was owned by Cruise Holdings I, LLC and was operated by ITG Vegas, Inc. During 2008, ITG Vegas, Inc. and Cruise Holdings I LLC were chapter 11 debtors-in-possession in a jointly administered case pending before this Court.

There is no dispute as to the chain of communication between those seeking to insure the Vessel and IINA, which issued the Policy and endorsements to the Policy. Tom Andersen is an insurance broker who assisted in obtaining insurance for the Vessel. At all times relevant to this case, Mr. Andersen provided information to Bonnie Levine, a broker employed by International Special Risks, Inc. ("ISR"). In turn, Bonnie Levine communicated with Deborah Marulli, an assistant vice president, manager and underwriter at ACE USA. ACE USA underwrites insurance policies issued by IINA. ACE USA underwrote the Policy under consideration here.

In mid and late 2008, ITG Vegas, Inc. and Cruise Holdings I LLC were attempting to sell the Vessel and its related business out of their jointly administered chapter 11 case. On July 8, 2008, ITG Vegas, Inc., Cruise Holdings I, LLC, and IKO Cruise Lines, LLC, as "Applicants", submitted an application to IINA, via Bonnie Levine and Deborah Marulli, entitled "Protection and Indemnity Insurance Application Form" (the "July 2008

2

Application").    The July 2008 Application indicates the "principal(s) and/or owner(s)" of the

Vessel as International Thoroughbred Breeders, Inc. and IKO Cruise Line LLC.  The 2008

Application is signed by "Chris Bono, Esq." on behalf of all three applicants.  It is unclear

whether Mr. Bono was authorized to act on behalf of any of them.  The Defendants did not

have any interest in the Vessel at the time of the July 2008 Application.

   At approximately the same time as the July 2008 Application, in July and August

2008, Tom Andersen communicated with Bonnie Levine, who in turn communicated with

Deborah Marulli, all by e-mail, about a potential sale of the Vessel to entities unrelated to

the Defendants.  It appears that the July 2008 Application was aimed at obtaining an

insurance quote in connection with this potential sale of the Vessel which in fact did not

occur.[1]

   On September 26, 2008, IINA executed the Policy.  The named assureds on the

Policy at issuance were ITG Vegas, Inc. and Cruise Holdings I LLC.  There is no dispute

that as of September 26, 2008 ITG Vegas, Inc. remained the operator of the Vessel and

Cruise Holdings I LLC remained the owner of the Vessel.  The Policy states:  "The Vessel,

for so much as concerns the Assured, by agreement between the Assured and the

Underwriters in this Policy, is and shall be valued at Ten Million and 00/100 ($10,000,000.)

Dollars."  There is no evidence addressing how the agreed value was established at $10

million.  The July 2008 Application form did not request the purchase price for the Vessel.[2]

   On November 4, 2008, the Defendants purchased the Vessel, with other assets

necessary to operate a "cruise-to-nowhere", from the bankruptcy estates of Cruise Holdings

---

[1] IINA states that it assumed the proposed sale to parties other than the Defendants actually closed.
However, not only was IINA not notified of such a closing in any way but, as noted below, IINA later
issued a policy in the names of the existing owner and operator of the Vessel.

[2] The Court notes that no insurance policy in the record reflects a "market" value for the Vessel.  The
value is consistently shown as the "agreed value."  This suggests a negotiated value for purposes of
coverage.

I, LLC, ITG Vegas, Inc. and certain affiliates, for a total purchase price of $2.9 million. The purchase price comprised $1.9 million in cash and assumption of $1 million in liabilities. In the asset purchase agreement, the parties allocated $1.4 million of the cash component to the Vessel and $500,000 of the cash component to intangibles. The Defendants state that their total investment in connection with acquisition of the Vessel and the related business was approximately $4 million.

On February 18, 2009, Deborah Marulli received an e-mail from Bonnie Levine that read as follows:

> Hi everyone
>
> I was cleaning up my file because we are not paperless and while reading through the 5585 USGC poll application recently sent to me by WQIS I noticed we had a difference in the named assured.
>
> We need to amend the named assured to Ocean Development I LLC (operator) and Platinum Real Estates (owner) the d/b/a Palm Beach Casino Lines stays.
>
> Debbie Please endorse the policy to correct the named assured effective inception.

Ms. Marulli responded, "Bonnie why the name change? Any change in ownership, exposure etc…." Ms. Levine then replied, "Tom completed the app wrong the first time when I kept pressing him for an app. I was going through the file and noticed the pollution app filed by the assured with the USCG the 5585 had a different name . . . and the rest is history."

From these communications it appears that Ms. Levine already knew of the November 2008 sale of the Vessel to the Defendants. Ms. Levine was involved in providing two policies of insurance in connection with the Vessel, the Policy and a water pollution policy. When reviewing her file, Ms. Levine discovered that these two policies showed different assureds. She immediately concluded that the Defendants were the proper

4

assureds under the Policy, and requested that Ms. Marulli obtain an endorsement to reflect the correct names.  If Ms. Levine did not already know that the Defendants were the owner and operator of the Vessel, she could not have so readily requested the necessary change to the Policy.

IINA argues that the application, or "app", referred to by Ms. Levine in her communication with Ms. Marullli in February 2009 refers to the July 2008 Application. Ms. Levine stated: "Tom completed the app wrong the first time when I kept pressing him for an app." The name "Tom" refers to Tom Andersen.  Mr. Andersen testified in deposition that he was not involved in the July 2008 Application.  Thus, it appears unlikely that the application referred to by Ms. Levine in February 2009 was the July 2008 Application.  The record contains no application tendered by or on behalf of the Defendants themselves.

As a result of Ms. Levine's communication with Ms. Marulli, IINA issued an endorsement to the Policy reflecting the Defendants as assureds (the "Endorsement").

On September 8, 2009, in response to new insurance quotes received from Bonnie Levine, Tom Andersen suggested that the hull policy for the Vessel be determined based on a reduced $4 million limit.  Ms. Levine forwarded Mr. Andersen's request to Deborah Marulli, without copying Mr. Andersen, and suggested quoting the hull policy based on a $5 million limit.[3]  Ms. Marulli then communicated with Karen Griswald, vice president at ACE USA, regarding the Policy limit.  Ms. Griswald expressed concern that the Vessel might be underinsured at a $5 million limit.  Ms. Marulli e-mailed Ms. Griswald stating:  "Karen this expires on Saturday.  Please give a call so we can chat about this.  Basically the vessel was sold last year to Ocean Development for $4M.  Which in the recession that is what it was

---

[3] The fact that Ms. Levine suggested a quote based on a $5 million limit, $1 million higher than that requested by Mr. Andersen, apparently without addressing the matter further with Mr. Andersen, supports the conclusion that Ms. Levine acted as agent for the insurer rather than for the assureds (see below).

worth at that time.  Bonnie's broker is looking to decrease the limit to $5M and take up the
Hull rate from the current $1.37 to $2.25."  It is apparent from this e-mail that Ms. Marulli
herself knew of the sale to the Defendants in 2008 and the amount of their total
investment, at least as of September 15, 2009.  Ms. Griswald authorized the new policy
limit of $5 million and the Policy was amended on October 21, 2009 effective as of its
inception.

Also on September 8, 2009, the Vessel suffered a catastrophic failure of its main
engine when a connecting rod in the engine's number 9 cylinder sheared apart and broke
through the engine's sides and bed plate (the "Loss").

On December 24, 2009, defendant Ocean Development 1, LLC ("Ocean") filed a
voluntary chapter 11 petition.  At that time, Ocean and defendant Platinum Real Estates,
LLC ("Platinum") remained, respectively, the operator and owner of the Vessel.

In its *Second Amended Complaint for Declaratory Relief* [ECF No. 168] (the
"Complaint") IINA seeks declaratory relief against the Defendants.  Count I of the
Complaint requests a ruling that the Policy is void *ab initio* based upon the doctrine of
*uberrimae fidei*.  Count II of the Complaint requests a ruling that the Policy does not afford
coverage for the Loss based upon the Defendants' breach of the negative implied warranty
of seaworthiness.  Count III of the Complaint requests a ruling that the damages arising
from the Loss are expressly excluded from the Policy.

In the Motion, IINA seeks summary judgment in its favor on Count I of the
Complaint.  IINA argues that neither the identity of Platinum as purchaser of the Vessel in
November 2008 nor the purchase price were disclosed to IINA and that, as a result, the
Policy is void *ab initio* pursuant to the marine insurance doctrine of *uberrimae fidei*.

Federal Rule of Civil Procedure 56(a), made applicable to this matter by Federal
Rule of Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary

6

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). In considering a motion for summary judgment, the Court must construe all facts and draw all reasonable inferences in the light most favorable to the non-moving party. *Id.*

The moving party has the burden of establishing that there is an absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets that burden, the burden shifts to the non-movant, who must present specific facts showing that there exists a genuine dispute of material fact. *Walker v. Darby*, 911 F.2d 1573, 1576 (11th Cir. 1990) (citation omitted). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Id.* (*citing Anderson*, 477 U.S. at 252).

"*Uberrimae fidei* refers to the requirement of 'utmost good faith' called for in marine insurance policies, whereby an insured must fully and voluntarily disclose to the insurer all facts material to calculating an insurance risk." *I.T.N. Consolidators, Inc. v. N. Marine Underwriters Ltd.*, No. 10-15152, 2012 U.S. App. LEXIS 2799, *5 n.3 (11th Cir. Feb. 13, 2012). "It is well-settled that the marine insurance doctrine of *uberrimae fidei* is the controlling law" in the Eleventh Circuit. *HIH Marine Servs., Inc. v. Fraser*, 211 F.3d 1359, 1362 (11th Cir. 2000).[4] "*Uberrimae fidei* requires that an insured fully and voluntarily disclose to the insurer all facts material to a calculation of the insurance risk." *Id.* "The duty to disclose extends to those material facts not directly inquired into by the insurer." *Id.*

---

[4] Neither party argues that *uberrimae fidei* does not apply to the Policy at issue in this case.

"Under *uberrimae fidei,* a material misrepresentation on an application for marine insurance is grounds for voiding the policy." *Id.* at 1363. "A misrepresentation is material if 'it might have a bearing on the risk to be assumed by the insurer.'" *Id.* (quotation omitted). Because the "central principle of *uberrimae fidei* [] is that the insured bears the burden of full and voluntary disclosure of facts material to the decision to insure," the law places the "burden of good faith disclosure with the person in the best position to know all the facts: the insured." *Id.* (citation omitted). "Nothing is better established in the law of marine insurance than that a mistake or commission [sic] material to a marine risk, whether it be willful or accidental, or result from mistake, negligence or voluntary ignorance, avoids the policy." *Gulfstream Cargo, Ltd. v. Reliance Ins. Co.,* 409 F.2d 974, 980 (5th Cir.1969) (quotation omitted).

The principle of *uberrimae fidei* does not require the voiding of the contract unless the misrepresentation or undisclosed facts were material and were relied upon by the insurer. *Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866, 871 (2d Cir. 1985); *State Nat'l Ins. Co. v. Anzhela Explorer, L.L.C.*, 812 F. Supp. 2d 1326, 1352 (S.D. Fla. 2011); *see also I.T.N. Consolidators, Inc. v. N. Marine Underwriters Ltd.*, No. 10-15152, 2012 U.S. App. LEXIS 2799, *16 (11th Cir. Feb. 13, 2012) ("Because all parties knew of the loss here, a misrepresentation that no known loss had occurred could not have led Northern to rely on that statement, and would in no way constitute a material misrepresentation in breach of *uberrimae fidei*."). A misrepresentation or concealment is material if "it might have a bearing on the risk to be assumed by the insurer." *HIH Marine Servs., Inc.,* 211 F.3d at 1363 (quotation omitted). However, "'[a] minute disclosure of every material circumstance is not required. The assured complies with the rule if he discloses sufficient [information] to call the attention of the underwriter in such a way that, if the latter desires further

8

information, he can ask for it.'" *Puritan Ins. Co.*, 779 F.2d at 871 (quoting 2 M. Mustill & J. Gilman, *Arnould's Law of Marine Insurance and Average* § 646, at 493 (16th ed. 1981)).

For *uberrimae fidei* to apply in this case, IINA must show that the Defendants misrepresented or failed to disclose a material fact. IINA argues that the July 2008 Application contains misrepresentations as to the identity of the purchaser of the Vessel and the purchase price of the Vessel and that the Defendants adopted those representations when they requested the Endorsement in February 2009 to reflect the correct named assureds on the Policy. IINA argues that the Defendants made misrepresentations as to the timing of Platinum's purchase of the Vessel when the Defendants requested the Endorsement. IINA also argues that under *uberrimae fidei* the Defendants have a continuing duty to disclose material information to IINA throughout the Policy period and that the Defendants failed to properly apprise IINA of their purchase of the Vessel and the purchase price.

There is no evidence that the Defendants adopted any representation in the July 2008 Application, in February 2009 when the Endorsement was requested or at any other time. Indeed, there is no evidence that the Defendants even knew of the July 2008 Application prior to commencement of this case. A misrepresentation or non-disclosure that may void the Policy must be "made by the insured prior to coverage attaching." *State Nat'l Ins. Co. v. Anzhela Explorer, L.L.C.*, 812 F. Supp. 2d 1326, 1352 (S.D. Fla. 2011). Based on the evidence before the Court at the summary judgment stage, any alleged misrepresentations or non-disclosures by the prior owner and operator of the Vessel, before original issuance of the Policy, have no bearing on this case.

IINA also argues that there is a continuing duty under *uberrimae fide,* throughout the term of a Policy, and that the Defendants breached this duty by failing to disclose their

9

purchase of the Vessel and the purchase price.  The doctrine of *uberrimae fidei* requires the disclosure by the potential insured of material information to the insurer.  Information is material if it might have a bearing on the risk to be assumed by the insurer.  The applicant's duty to inform the insurer of facts materially affecting the risk extends through the date of issuance of the policy, including the period after the application is tendered but before the policy attaches.  *Stipcich v. Metropolitan Life Ins. Co.*, 277 U.S. 311, 316-18 (1928).  Once a policy attaches, there is no new risk to be assumed by the insurer; the risk is already accepted.  As such, it makes no sense for the doctrine of *uberrimae fidei* to encompass a continuing duty after issuance of a policy.   In any case, the Policy did not insure the Defendants until the Endorsement was issued.  Prior to that date, they were not listed as assureds under the Policy.  The Defendants could not have had a continuing duty under a policy that did not ensure them.[5]

It is possible that a request to endorse the Policy to change the named assureds implicates the doctrine of *uberrimae fidei.  See HIH Marine Services, Inc. v. Fraser*, 211 F.3d 1359, 1361 (11th Cir. 2000) (applying the doctrine of *uberrimae fidei* where an insured requested an endorsement to add an additional insured vessel).  This is because an endorsement results in an amendment to the policy creating a new risk.  The record includes no written application that was tendered to IINA in connection with the Endorsement.  IINA makes much of the fact that Ms. Levine requested the Endorsement in February 2009 to correct the names of the assureds, three months after Platinum purchased the Vessel in November 2008, and that she stated that the name change was required because the original application was not correct.  IINA points to Ms. Levine's statements, in e-mails to Ms. Marulli, as containing material misrepresentations.  IINA's

_____

[5] Indeed, under IINA's version of the facts, by its own terms the Policy would have terminated upon the sale of the Vessel to the Defendants but for IINA's later Endorsement to correctly reflect the Defendants as the owner and operator of the vessel.

argument relies on its assertion that Ms. Levine acted as agent of the Defendants such that any misrepresentation or non-disclosure by Ms. Levine is imputed to the Defendants for purposes of the doctrine of *uberrimae fidei*.

There remains a genuine issue of fact as to whether Ms. Levine acted as agent for the Defendants.  Indeed, the evidence at this stage of the case tends to show that Ms. Levine was instead an agent for the insurer.  From the point of view of the Defendants, Ms. Levine was the sole contact point for IINA.  The evidence does not show any communication by Mr. Andersen, or anyone else on behalf of the assureds, directly with an employee of the insurer or its underwriter.  The communications between Mr. Andersen and Ms. Levine are sometimes in the nature of negotiation rather than conveyance of information.  It would be strange, indeed, for one agent of the Defendants to negotiate a policy limit with another agent of the Defendants.  Ms. Levine's communications with Karen Griswold at ACE USA regarding the request to reduce the hull policy limit, requesting a higher limit than that proposed by Mr. Andersen, suggest that she was aligned with the insurer rather than with the insured.  These facts tend to support a conclusion that Ms. Levine acted as agent for IINA rather than for the Defendants.

If Ms. Levine acted as an agent for IINA, her knowledge with regard to the Vessel is imputed to IINA.  Evidence in the record indicates that Ms. Levine knew of the November 2008 sale of the Vessel to Platinum prior to February 2009.  Ms. Levine's later communication with Ms. Marulli shows that Ms. Levine knew both the identity of the purchaser of the Vessel and the total amount invested.  If all of this information is attributed to IINA, the request for the Endorsement is shown in a new light.  Ms. Levine, having reviewed her records and realizing that the Policy indicated the wrong names for the assureds, contacted her principal to advise that the Policy should be corrected.  Under

this scenario, the Defendants made no misrepresentation.  Indeed, they made no representation at all.  The Defendants did not even request the Endorsement.

It is not possible to conclude from the evidence currently before the Court whether Ms. Levine acted as agent for IINA, for the Defendants, or for no one.  It is also not possible to find with any certainty what was known by whom and when.  These facts are in dispute and are material to the case.

Even if the evidence showed conclusively that Ms. Levine was an agent of the Defendants with regard to requesting the Endorsement of the Policy, any misrepresentations or non-disclosures must be material and relied upon by IINA in issuing the Endorsement.

IINA argues that the identity of the owner of a vessel and the purchase price of the vessel are material as a matter of law.  Materiality -- that is "whether the risk be increased so as to enhance the premium" -- is a question of fact.  *M'Lanahan v. Universal Ins. Co.*, 26 U.S. 170, 188 (1828).  Although some courts have held that where a marine insurance application directly and explicitly inquires into a subject a presumption arises as to the materiality of that particular question, the Eleventh Circuit "has never adopted such a bright line rule.  Instead, courts in our circuit favor a more fact-specific inquiry."  *Great Lakes Reinsurance (UK) PLC. v. Roca*, No. 07-23322, 2009 WL 200252 (S.D. Fla. Jan. 27, 2009); *see also AIG Centennial Ins. Co. v. O'Neill,* No. 09-60551, 2010 WL 4116555 (S.D. Fla. Oct. 18, 2010).  In cases where the purchase price was found to be material for purposes of the doctrine of *uberimmae fidei*, the relationship between the true market value and the stated value of the vessel was typically quite extreme.  *See, e.g., Albany Ins. Co. v. Wisniewski,* 579 F. Supp. 1004, 1016-17 (D.R.I. 1984) (insured value more than 20 times market value) *and King v. Aetna Ins. Co.*, 54 F.2d 253, 254-55 (2d Cir. 1931) (insured value

12

16 times market value).  It is possible that the Defendants obtained a bargain in acquiring the vessel.  *See Rosenthal v. Poland*, 337 F. Supp. 1161, 1168-69 (S.D.N.Y. 1972).  The determination of whether ownership and purchase price are material for purposes of *uberrimae fidei* should be made on a case-by-case basis.

Deborah Marulli submitted two declarations in which she states that had she been aware of the facts regarding the Vessel's purchase price and the identity of the Defendants as purchaser in November 2008, IINA would have declined to ensure the Vessel.  Had the change in ownership been disclosed, she declares, she would not simply have endorsed the policy as requested, because "[o]wnership in the property is material to the underwriting process as the insured must have an interest in the property in order to be eligible for coverage."  Ms. Marulli also declares that the "purchase of a vessel by a buyer for an amount significantly less than the insured value presents an increased risk; the buyer has less incentive to prevent losses to the insured property.  Given the low purchase price in this instance, Platinum Real Estates could profit from a loss."

"After-the-fact, conclusory statements by the insurer that a certain fact was material and would have affected its decision to insure are not enough.  An insurer must provide some specific evidence capable of showing the omitted fact's materiality and the Court must consider that evidence under an objective standard – whether a reasonable person in the assured's position would know that the particular fact is material."  *State Nat'l Ins. Co. v. Anzhela Explorer, L.L.C.*, 812 F. Supp. 2d 1326, 1353 (S.D. Fla. 2011) (internal and external citations omitted).  Ms. Marulli's affidavits do not meet this standard.  Based on evidence presently before the Court, IINA's own actions, and correspondence between Ms. Marulli and Ms. Levine, belie Ms. Marulli's statements that the identity of the purchaser and the purchase price were material to the risk and their non-disclosure was relied upon by IINA.

There are genuine issues of material fact as to whether these matters were material to and were relied upon by IINA.

Accordingly, it is ORDERED AND ADJUDGED that the Motion [Adv. Pro. No.:10-03313-EPK, ECF No. 82 and Adv. Proc. No.:11-01829-EPK, ECF No. 37] is DENIED.

### 

Copies furnished to:

All counsel of record.